**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KO IWASAKI,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.: 3:24-cv-00164** |
| **P&G RARE VIOLINS, INC.** | § | |
| **(d/b/a "BEIN & FUSHI, INC.")** | § | |
| **AND** | § | |
| **BEN-DASHAN INC.** | § | |
| *Defendants.* | § | |
| | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Ko Iwasaki, Plaintiff in the above-entitled and numbered action, and files this Third Amended Complaint against Defendant P&G Rare Violins, Inc. (d/b/a "Bein & Fushi, Inc.") and Defendant Ben-Dashan Inc. (collectively "Defendants"), in support thereof, respectfully states and alleges as follows:

### I.   PARTIES AND SERVICE

1.   Plaintiff, Ko Iwasaki, is an individual resident of the State of Texas who resides in Dallas, Collin County, Texas.

2.   Defendant, P&G Rare Violins, Inc. (d/b/a "Bein & Fushi, Inc.") is a corporation doing business in Cook County, Illinois. Defendant P&G Rare Violins, Inc. has been served, has filed for removal, and has filed a motion to dismiss.

3.   Defendant, Ben-Dashan Inc. is a corporation doing business in Cook County, Illinois. Defendant Ben-Dashan has been served, has filed for removal, and has filed a motion to dismiss.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action because there is a diversity of citizenships between the parties and the amount in controversy exceeds $75,000.00.

5.    Venue is proper in the Northern District of Texas because the transaction underlying Plaintiff's injury involved the sale of a good in Dallas, Texas, and, therefore, occurred in Dallas, Texas.

6.    Venue is further proper because Defendants marketed their good(s) to Plaintiff in Dallas, Texas; transacted with Plaintiff in Dallas, Texas; made communications underlying Plaintiff's claims direct at Dallas, Texas, and because Plaintiff's injury, which was caused by Defendants' acts and omissions, occurred in Dallas, Texas.

## III.    FACTUAL BACKGROUND

7.    Based upon a felony complaint (the "Criminal Complaint") filed in the Criminal Court of the City of New York against Olivier Fluchaire ("Fluchaire"), Fluchaire stole property, possessed stolen property, and engaged in a scheme consisting of systematic ongoing course of conduct with the intent to defraud. A true and correct copy of the Criminal Complaint is attached hereto as **Exhibit "A"**.

8.    In or around June of 2015, Fluchaire and Séverine Lauxerrois ("Lauxerrois") entered into an agreement, whereby Fluchaire would purchase a François Xavier Tourte cello bow ("FX Tourte Bow", "FXT Bow", or the "Bow"), a valuable antique cello bow, from Lauxerrois for €100,000.00. Fluchaire took possession of the FX Tourte Bow and paid Lauxerrois a down payment of €15,000.00.

Plaintiff's Third Amended Complaint

9.      Fluchaire made several payments towards the purchase price of the FX Tourte Bow but did not ultimately pay the €100,000.00 that Fluchaire and Lauxerrois agreed upon. Fluchaire avoided paying Lauxerrois the full amount owed and thereby stole the FX Tourte Bow.

10.     On or about February 3, 2016, Fluchaire shipped the FX Tourte Bow to Gabriel Ben-Dashan ("Ben-Dashan"), President of Defendant Ben-Dashan, Inc. ("BDI") and Bein and Fushi, Inc. ("B&F"), the predecessor of Defendant P&G Rare Violins, Inc. d/b/a Bein & Fushi, Inc. ("P&G", and collectively with BDI "Defendants").

11.     On or about February 27, 2016, Fluchaire negotiated the sale of the FX Tourte Bow with Ben-Dashan for $167,500.00.

12.     Between February 2016 and September 2016, Paige Ben-Dashan, Secretary of BDI, communicated with Fluchaire through a series of emails. Immediately prior to, during, and after the sale of the FX Tourte Bow, BDI requested from Fluchaire provenance materials – including certificates of authenticity and bills of sale – related to the FX Tourte Bow's ownership history.

13.     BDI requested the provenance materials to establish that Fluchaire and – following the sale of the FX Tourte Bow to BDI – BDI, itself, had good and marketable title to sell the bow.

14.     Fluchaire provided no evidence of his ownership of the FX Tourte Bow to BDI.

15.     BDI continued to follow up with Fluchaire about receiving evidence of the chain of ownership of the FX Tourte Bow. Fluchaire ignored each of BDI's requests and, after receiving final payment from BDI on September 7, 2016, ceased communication altogether with BDI.

16.     BDI knew or should have known that it did not have verifiable title to the FX Tourte Bow.

17.     Following its purchase of the FX Tourte Bow, BDI consigned the Bow to B&F.

Plaintiff's Third Amended Complaint

18. BDI did not provide provenance documentation to B&F because it did not have such documentation.

19. As experienced dealers of antique musical instruments, BDI and B&F were aware – yet acted indifferently towards – the risk of selling the FX Tourte Bow without proof of ownership. BDI and B&F knew or should have known that they could not sell the FX Tourte Bow without proof of ownership.

20. Plaintiff Ko Iwasaki ("Plaintiff") is an accomplished cellist based in the United States. Mr. Iwasaki has won top prizes in numerous international cello competitions, performed as a soloist and chamber musician, judged international competitions, and taught at several universities.

21. Plaintiff had a close relationship with B&F. In fact, Plaintiff had a personal friendship with Robert Bein, co-founder of B&F, for many years prior to his passing in 2007.

22. In part, due to their close relationship, Plaintiff and his family purchased instruments and bows from B&F and was afforded special treatment and service such that he expected B&F to conduct itself according to Plaintiff's best interests. In fact, Plaintiff purchased a Stradivarius cello, currently valued at approximately $5,000,000.00, from B&F in or around 1980. From time to time, B&F contacted Plaintiff by telephone call to his home in Dallas, Texas to market to him B&F's new acquisitions. Since around 1980, B&F also sent Christmas cards and annual promotional calendars to Plaintiff's home to market to him.

23. Based upon B&F's marketing efforts to Plaintiff in Dallas, Texas, Plaintiff would often visit B&F's business in Chicago whenever he traveled nearby.

24. In May of 2016, Plaintiff was visiting B&F when Ben-Dashan presented the FX Tourte Bow to him. Plaintiff was interested in purchasing the FX Tourte Bow, so Ben-Dashan

Plaintiff's Third Amended Complaint

offered Plaintiff to borrow the Bow and take it back to his home in Dallas to test it "on approval". Plaintiff agreed and took possession of the Bow which he took back to his home in Dallas, Texas. Plaintiff used and practiced with the Bow in Dallas.

25. In or around May of 2016, Plaintiff and Ben-Dashan, on behalf of BDI and B&F, negotiated the sales price of the Bow over a telephone call. Ben-Dashan knew the FX Tourte Bow and Plaintiff were in Texas at the time of the negotiations. Ben-Dashan offered to sell the FX Tourte Bow to Plaintiff for $275,000.00. Ben-Dashan represented to Plaintiff that the sales price accounted for a passing of title, appraisal services, and certificates of authenticity. Ben-Dashan materially misrepresented that B&F had title to the FX Tourte Bow to Plaintiff. This representation was false. Ben-Dashan knew the representation was false or made with reckless disregard for the truth and without knowledge of the truth. Ben-Dashan intended Plaintiff to act in reliance on that misrepresentation.

26. Plaintiff, justifiably relying on Ben-Dashan's representations, agreed to purchase the FX Tourte Bow for $275,000.00.

27. The negotiations and sale occurred over the phone, and, at all times during the negotiations and sale, Plaintiff and the Bow were located in Texas.

28. At the time BDI and B&F sold the FX Tourte Bow to Plaintiff, they had not received any documentation from Fluchaire evidencing proof of ownership of the bow. BDI and B&F never informed Plaintiff that they did not have title to the Bow.

29. At the time of the sale, the Bow was consigned to B&F by BDI, and B&F was acting for itself and as an agent of BDI.

30. BDI and B&F did not inform Plaintiff, and Plaintiff did not know, that the Bow was sold on consignment.

Plaintiff's Third Amended Complaint

31.     On or about May 27, 2016, B&F sent an invoice to Plaintiff's home in Dallas stating that he owed an initial deposit of $25,000.00 and the remaining $250,000.00 of the purchase price by June 17, 2016. The invoice further noted, "Tax Exempt – Shipped out of state."

32.     Enclosed with the invoice was an insurance appraisal, wherein B&F concluded that the FX Tourte Bow's replacement value and amount of insurance coverage were $350,000.00. B&F's appraisal represented to Plaintiff that, if the bow were ever to be lost, stolen, or damaged, Plaintiff would be able to recover the amount he paid for the bow. The appraisal was signed by Ben-Dashan.

33.     B&F also sent to Plaintiff at his home in Dallas a handwritten letter representing that, upon receipt of the full purchase amount, B&F would issue two certificates of the FX Tourte Bow's authenticity.

34.     Plaintiff sent the $25,000.00 deposit to B&F upon his receipt of the invoice and paid the remaining $250,000.00 on or before June 17, 2016. The deposit was paid by check made and sent from Dallas, Texas. The remaining balance was paid via wire transfer initiated in Dallas, Texas.

35.     In or around June of 2017, B&F sent a letter to Plaintiff's Dallas home to notify Plaintiff of its receipt of payment in full and issued two certificates, one by B&F and one by Paul Childs, both of which claimed to verify the bow's authenticity.

36.     Previously B&F's website – and currently P&G's website –, beinfushi.com, claims that its Certificates of Authenticity "are the most trusted and sought-after in the world."

37.     In the Certificate of Authenticity issued to Plaintiff, B&F represented that the FX Tourte Bow showed no signs of ownership. The certificate reads: "the cello bow sold by [B&F] to Mr. Ko Iwasaki of Dallas, Texas was made by the celebrated maker Francois Xavier

Plaintiff's Third Amended Complaint

Tourte of Paris … and is unbranded." Similarly, Paul Childs noted that the bow had "no brand-stamp."

38. Plaintiff, while a renowned cellist, is an ordinary consumer. Plaintiff does not routinely deal in the purchase or sale of antique instruments or bows. While able to acutely identify the quality of instruments or bows, Plaintiff as an ordinary purchaser had no way of inferring from the statements made by BDI and B&F that they did not possess title to the Bow. The certificates of authenticity provided by BDI and B&F were silent as to title to the Bow and BDI and B&F never disclosed to Plaintiff that they did not possess title to the Bow.

39. On or about September 7, 2016, BDI wired final payment to Fluchaire for the FX Tourte Bow. Neither BDI nor B&F had received any documentation evidencing Fluchaire's lawful ownership of the FX Tourte Bow. Following Fluchaire's receipt of the final payment, he ceased all communications with BDI and B&F.

40. In 2019, Lauxerrois, having not received the full €100,000.00 payment for the Bow from Fluchaire, began to repeatedly request that Fluchaire return the FX Tourte Bow in exchange for his partial payments totaling €30,000.00. At this time, Plaintiff was in possession of the FX Tourte Bow in Dallas.

41. In or around 2021, P&G purchased substantially all the assets of B&F and began doing business under the trade name "Bein & Fushi, inc." and "Bein & Fushi", among other substantially similar names. Upon information and belief, the purchase occurred in Illinois. Based upon P&G's formation documents, P&G was incorporated in Illinois.

42. P&G operates identically to B&F under the same business name, "Bein & Fushi, inc.". P&G's business address has not changed. P&G's inventory is the same, P&G's equipment

Plaintiff's Third Amended Complaint

is the same, P&G's staff is substantially the same (i.e., Gabriel and Paige Ben-Dashan), P&G's telephone number is the same, and P&G's website is hosted at the same address, beinfushi.com. P&G conducts the same business as "Bein & Fushi, inc." with the same trade dress and, in doing so, utilizes the good will of the "Bein & Fushi, inc." name.

43. Based on the website, beinfushi.com, P&G fulfilled and/or honored "Bein & Fushi, inc.'s" obligations incurred prior to its acquisition of the same, including fulfilling or honoring prior sales agreements. The website states, "Since 1976, Bein & Fushi has taken its place as the world's premier dealer and restorer of fine stringed instruments. We have accomplished this by establishing a firm in the tradition of the greatest shops of the past… Founded by the late Geoffrey Fushi and Robert Bein, the firm provides unparalleled authentication and expertise. The Bein & Fushi Certificate is sought-after around the world. Bein & Fushi offers the broadest selection of fine antique and modern instruments for students, professionals, and collectors as well as world-class repair and restoration services."

44. Based on the website, Gabriel and Paige Ben-Dashan were principal decision makers and/or managers of "Bein & Fushi, inc." before and after P&G's acquisition of B&F's assets. "For nearly thirty years Gabriel Ben-Dashan was one of Bein & Fushi's greatest resources… Robert Bein increasingly relied on his judgment on acquisitions over the years as Gabriel developed a major international acquisitions network. Robert had the utmost trust and confidence in Gabriel to know just what instruments and bows were needed and to act on that knowledge." "Geoffrey [Fushi] and Robert [Bein] brought Gabriel and his wife, Paige, into the company as a team to run their office together." The website also states, "Gabriel Ben-Dashan, Owner and Executive Director."

Plaintiff's Third Amended Complaint

45.  P&G touts "International Clientele", who died prior to P&G's acquisition of B&F, including Ruggiero Ricci, died August 5, 2012; Lord Yehudi Menuhin, died March 12, 1999; and Isaac Stern, died September 22, 2001. P&G similarly claims productions and publications made prior to its 2021 acquisition, including "The Miracle Makers: Stradivari • Guarneri • Oliveira" and "How Many Strads? *Our Heritage from the Master*". P&G even advertises notable sales of works by Francois Xavier Tourte.

46.  In or around 2022, Plaintiff purchased an insurance policy insuring the FX Tourte Bow. In connection with the policy, the FX Tourte Bow was appraised for $425,000.00.

47.  On January 30, 2023, Plaintiff received an email from the U.S. Department for Homeland Security ("DHS"), informing Plaintiff that the FX Tourte bow was strongly believed to have been stolen from its legal owner. This was the first time that Plaintiff was ever told that the FXT Bow was possibly stolen.

48.  Prior to Plaintiff's receipt of the January 30 email, he had no reason to suspect that he did not possess title to the FX Tourte Bow or that it had been stolen. Plaintiff's receipt of DHS's email represented the first time that he received notice that the Bow was stolen property, and that BDI and B&F did not have good and marketable title to the Bow at the time of its purchase. When Plaintiff received such notice, Plaintiff and the Bow were located in Dallas, Texas.

49.  Under Texas law, stolen property is contraband subject to seizure and forfeiture. BDI and B&F had no right to sell the FX Tourte Bow.

50.  On or about April 14th of 2023, Plaintiff's counsel signed a stipulation with the New York County District Attorney's Office to represent that Plaintiff acknowledged the FX Tourte Bow's status as stolen property and waived all claims related to the FX Tourte Bow as to

DANY or the DHS under federal law.[1] In connection with the stipulation, Plaintiff was required to surrender the FX Tourte Bow to DHS in Dallas, Texas. DHS agents traveled to Dallas, Texas to take possession of the FXT Bow.

51. Shortly thereafter, Plaintiff received a second letter in which DANY informed him that the Bow was scheduled to be released to its legal owner, Lauxerrois, within fifteen (15) days from the date of the letter.

52. In December of 2023, Fluchaire was convicted for stealing the FXT Bow.

53. As a result of BFI and BDI's illegitimate sale of the FX Tourte Bow to Plaintiff, Plaintiff suffered the loss of the Bow and the loss of the $275,000 he paid BFI and BDI for its sale.

54. On or about April 17, 2023, Plaintiff sent to Defendants, by and through their agents Gabriel Ben-Dashan and Paige Ben-Dashan, correspondence demanding that they compensate Plaintiff for their sale of the stolen Bow.

55. Defendants have not offered to compensate Plaintiff and continue to fail to pay Plaintiff's demand.

56. As a result of Defendants' acts and omissions, Plaintiff has been deprived of the Bow and of the $275,000.00 with which he paid.

57. Based upon Exhibit A, the FX Tourte Bow has a present value in excess of $500,000.00.

### IV.    SUCCESSOR LIABILITY AS TO P&G RARE VIOLINS, INC.

58. Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

59. P&G is an Illinois corporation. Therefore, Illinois law should apply with respect to successor liability. *See* Restatement (Second) Conflict of Laws § 302 (under general choice of law principles, the law of the state of incorporation generally applies to successor liability).

---

[1] A true and correct copy of the signed stipulation is hereby attached as **Exhibit "B"**.

Plaintiff's Third Amended Complaint

60. Illinois recognizes the four traditional successor liability exceptions to impose a seller corporation's liabilities upon a buyer corporation, being (1) an express or implied assumption of the seller's liabilities; (2) a merger occurring between the buyer and seller; (3) the buyer acting as a mere continuation of the seller; or (4) the transaction being completed for fraudulent purposes.

61. Gabriel Ben-Dashan was an owner, controlling manager, and/or principal decision maker of "Bein & Fushi" prior to P&G's purchase of substantially all of B&F's assets in 2021. Gabriel Ben-Dashan was president of P&G since its formation and is the "Owner and Executive Director" of "Bein & Fushi". Moreover, P&G operated under the same trade name, at the same address, and with the same inventory, equipment, telephone number, and website as B&F. Additionally, Paige Ben-Dashan was "brought… into [Bein & Fushi]… to run their office…" prior to the 2021 purchase and is currently an executive director of P&G.

62. Simply by looking at its website, there is no detectable change from before P&G purchased B&F to afterwards. P&G has stepped into the shoes and adopted the history of B&F in every aspect. P&G is a mere continuation of B&F. Therefore, P&G is liable for the conduct of B&F complained of herein.

63. In the alternative, P&G expressly or impliedly assumed the obligations and liabilities of B&F.

64. Because P&G does business at the same address, with the same telephone number, and with the same website, it can be inferred that P&G assumed some or all of B&F's lease obligations, B&F's telephone service obligations, and/or B&F's website hosting and maintenance obligations. Furthermore, upon information and belief, P&G honored B&F's prior agreements, including sales agreements. Again, P&G stepped into the shoes of B&F and adopted the entirety of its history, and, in doing so, P&G has impliedly assumed the liabilities

of B&F.

65. P&G either expressly or impliedly assumed the liabilities of B&F. Therefore, P&G is liable for the conduct of B&F complained of herein.

66. In the alternative, P&G and B&F merged. The foregoing circumstances may also evidence a merger between P&G and B&F. Should such a merger have occurred, P&G is liable for the conduct of B&F complained of herein.

### V. FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT (IMPLIED AND EXPRESS WARRANTY) AS TO ALL DEFENDANTS

67. Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

68. Plaintiff and Defendants entered into a valid contract whereby Plaintiff was to pay $275,000.00 in exchange for the FX Tourte Bow.

69. Plaintiff is a buyer as defined by Tex. Bus. & Com. Code § 2.103(1).

70. Defendants are sellers as defined by Tex. Bus. & Com. Code § 2.103(4).

71. The sale of the FX Tourte Bow is a contract for sale as defined by Tex. Bus. & Com. Code § 2.106.

72. Defendants breached the contract by breaching their implied warranty provided by Tex. Bus. & Com. Code § 2.313 that the title to the Bow conveyed was good, and its transfer rightful.

73. Defendants breached the contract by breaching their express warranties (1) that the title to the Bow conveyed was good, and its transfer rightful and (2) that Plaintiff would be compensated should the Bow be lost, stolen, or damaged.

74. Plaintiff was damaged by his loss of the Bow.

### VI. SECOND CLAIM FOR RELIEF – NEGLIGENT MISPRESENTATION AS TO ALL DEFENDANTS

75. Plaintiff incorporates all of the factual allegations in the preceding paragraphs by reference as if fully set forth herein.

Plaintiff's Third Amended Complaint

76. Defendants, by and through their agents, Gabriel Ben-Dashan and Paige Ben-Dashan, made misrepresentations to Plaintiff in the course of their business regarding the transfer of legal ownership of the bow, the coverage of Plaintiff's insurance policy, and the validity and authenticity of BFI's sale, appraisal services, and certificates.

77. Defendants failed to exercise reasonable care and competence in making their representations.

78. Plaintiff justifiably relied on their representations.

79. Plaintiff was damaged by his reliance on the representations.

## VII.   THIRD CLAIM FOR RELIEF –NEGLIGENCE AS TO ALL DEFENDANTS

80. Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

81. Defendants owed Plaintiff a duty of reasonable care to verify BDI's title to the FX Tourte Bow prior to selling the Bow to Plaintiff, to warn Plaintiff of the possible defect in title, and not to sell Plaintiff stolen goods.

82. Defendants breached their duties by failing to verify their lawful ownership of the Bow. Defendants failed to exercise reasonable care by failing to disclose the strange circumstances of their failure to obtain provenance documents from Fluchaire. Defendants further breached their duty of reasonable care when they made misrepresentations related to the transfer of legal ownership, the coverage of Plaintiff's insurance policy, and the validity and authenticity of Defendants' sale, appraisal services, and certificates.

83. Defendants should have reasonably foreseen that their breaches would result in harm to Plaintiff by causing him to be deprived of the Bow. But-for Defendants' breaches, Plaintiff would not have been damaged.

84. Due to and in reliance upon Defendants' breaches, Plaintiff bought the stolen Bow, which

Plaintiff's Third Amended Complaint

he was subsequently forced to surrender.

## VIII.   FOURTH CLAIM FOR RELIEF –GROSS NEGLIGENCE AS TO ALL DEFENDANTS

85.    Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

86.    As experienced dealers of antique instruments, Defendants were aware of the risks involved in their actions but were actively indifferent to the rights of Plaintiff.

87.    As further evidenced by their continuous efforts to verify Fluchaire's lawful ownership of the Bow, Defendants subjectively knew that their selling of the Bow without title documentation carried an extreme degree of risk of harm to a potential buyer.

88.    Despite Defendants' awareness of such risk, Defendants proceeded to sell the Bow to Plaintiff in conscious indifference to Plaintiff's rights and welfare.

## IX.   FIFTH CLAIM FOR RELIEF – FRAUD AS TO ALL DEFENDANTS

89.    Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

90.     Defendants, by and through their respective agents, Gabriel Ben-Dashan and Paige Ben-Dashan, represented to Plaintiff explicitly and through their acts and omissions that Defendants had good and marketable title to the Bow.

91.    Defendants, by and through their respective agents, represented to Plaintiff that if the Bow were ever lost, stolen, or damaged, Plaintiff could recover the amount he paid Defendants for the Bow.

92.    Defendants did not have good and marketable title to the Bow, in that it was stolen. Furthermore, Defendants did not intend to compensate, nor have they compensated, Plaintiff for his loss of the Bow.

93.    Defendants' made these representations while knowing of their falsity or recklessly without knowledge of their truth. Defendants did not possess any evidence of Fluchaire or Defendants'

legal ownership of the Bow at any time, and Defendants knew or should have known that they did not have legal ownership of the Bow at any time based upon Fluchaire's overt avoidance to providing such evidence. Furthermore, Defendants' representations were made knowingly or recklessly because they never intended to compensate Plaintiff in the event that the Bow was lost, stolen, or damaged.

94.  Defendants' misrepresentations were intended to induce Plaintiff to agree to purchase the Bow for $275,000.

95.  Plaintiff justifiably relied upon Defendants' misrepresentations by purchasing the Bow for $275,000.

96.  As a result of Plaintiff's reliance, Plaintiff suffered damages. Plaintiff suffered the loss of both $275,000 and the loss of the Bow itself.

## X.      SIXTH CLAIM FOR RELIEF – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT AS TO ALL DEFENDANTS

97.  Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

98.  Plaintiff is a "consumer," as defined in the Act.

99.  Plaintiff sought to purchase a good from Defendants.

100.  Defendants, by and through their agents, Gabriel Ben-Dashan and Paige Ben-Dashan, violated the Texas Deceptive Trade Practices Act by the following:

   a.  Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
   b.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do not have;
   c.  Misrepresenting the authority of a salesman, representative, or agent to negotiate the final terms of a consumer transaction; and
   d.  Representing that a guaranty or warranty confers or involve rights, remedies, or obligations which it does not have or involve;

101.  In carrying out these deceptive acts, Defendants acted knowingly and intentionally.

Plaintiff's Third Amended Complaint

102.    As a result of Defendants' deceptive trade practices, Plaintiff suffered the loss of $275,000 and the loss of the value of the bow itself.

103.    Defendants' actions were a producing cause of Plaintiff's damages.

## XI.    SEVENTH CLAIM FOR RELIEF – FRAUD BY NON-DISCLOSURE AS TO ALL DEFENDANTS

104.    Plaintiff incorporates by reference all of the allegations above as if fully set forth herein.

105.    Defendants deliberately failed to disclose facts material to their May 2016 transaction involving the FX Tourte Bow, those facts being the strange circumstances surrounding their failure to receive provenance documents from Fluchaire and their lack of title to sell the FX Tourte Bow to Plaintiff. Defendants' failure was deliberate in that, being experienced dealers of antique musical instruments, they knew those facts were material to the transaction but failed to disclose them regardless.

106.    Defendants had a duty to disclose such facts to Plaintiff because BFI had a confidential relationship with Plaintiff, and BDI as principal of BFI in the underlying transaction abused such confidential relationship in its transaction with Plaintiff.

107.    Plaintiff was ignorant of the facts undisclosed by Defendants and did not have any opportunity to discover them.

108.    Defendants intended for Plaintiff to purchase the FX Tourte Bow based upon their nondisclosures.

109.    Plaintiff relied on Defendants' nondisclosures and purchased the FX Tourte Bow which caused him injury.

## XII.    DISCOVERY RULE

110.    To the extent necessary, Plaintiff hereby affirmatively pleads his reliance on the discovery rule in tolling each of the applicable statutes of limitations to which his claims are subject.

Page **16** of **18**

Plaintiff's Third Amended Complaint

111.  Plaintiff only could have known of and only did know of facts to support each of his causes of action on or after January 30, 2023, when DHS first informed Plaintiff that the Bow may have been stolen.

112.  Plaintiff had no reason to believe the FXT Bow was stolen prior to its sale or at any time before January 30, 2023.

113.  Plaintiff regularly used the FXT Bow without incident for his public performances and appearances since acquiring the Bow.

## XIII.  ATTORNEYS FEES

114.  Plaintiff requests attorneys' fees under Texas Civil Practice and Remedies Code Chapter 38 and under the Texas Deceptive Trade Practices Act.

## XIV.  PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Ko Iwasaki respectfully prays that Defendant P&G Rare Violins, Inc. (d/b/a "Bein & Fushi, Inc.") and Defendant Ben-Dashan Inc. be cited to appear and answer herein and that on final trial Plaintiff is awarded:

a.  Economic damages;

b.  Punitive damages;

c.  Treble damages;

d.  Attorneys' fees;

e.  Costs of court; and

f.  Such other and further relief, both legal and equitable, to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,

**SONG WHIDDON, PLLC**

*/ s/ Vrinda Bhuta*

_____

TAILIM SONG
State Bar No. 00792845
tsong@tailimsong.com
VRINDA BHUTA
State Bar No. 24128823
vbhuta@songwhiddon.com
8111 LBJ Freeway, Suite 480
Dallas, Texas 75251
(214) 528-8400 Telephone
(214) 528-8402 Facsimile
**ATTTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

On March 22, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Norther District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

*/s/ Vrinda Bhuta*

_____

Vrinda Bhuta

Plaintiff's Third Amended Complaint

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Oliver Fluchaire (M 48),

Defendant.

FELONY

ADA Christine DiDomenico
2123354352



Robert Fromkin, Shield #8614 of the U. S. Department of Homeland Security, states as follows:

*The defendant is charged with:*

| | | |
|---|---|---|
| 1 | PL 155.40(1) | Grand Larceny in the Second Degree (defendant #1: 1 count) |
| 2 | PL 165.52 | Criminal Possession of Stolen Property in the Second Degree (defendant #1: 1 count) |
| 3 | PL 165.50 | Criminal Possession of Stolen Property in the Third Degree (defendant #1: 9 count) |
| 4 | PL 165.45(1) | Criminal Possession of Stolen Property in the Fourth Degree (defendant #1: 9 count) |
| 5 | PL 190.65(1)(b) | Scheme to Defraud in the First Degree (defendant #1: 1 count) |

On or about May 22, 2023 at about 01:00 PM, at 318 East 81 Street; in the County and State of New York, the defendant stole property valued in excess of 50,000 dollars; the defendant knowingly possessed stolen property with a value in excess of 50,000 dollars with intent to benefit a person than an owner of the property and to impede recovery by an owner thereof; the defendant knowingly possessed stolen property with a value in excess of 3,000 dollars with intent to benefit a person other than an owner of the property and to impede recovery by an owner thereof; the defendant knowingly possessed stolen property valued over 1,000 dollars with intent to benefit a person other than an owner of the property and to impede recovery by an owner thereof; the defendant engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person and to obtain property from more than one person by false and fraudulent pretenses, representations and promises, and so obtained property with a value in excess of one thousand dollars from one and more persons;

*The factual basis for these charges are as follows:*

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Oliver Fluchaire (M 48),

Defendant.

FELONY

ADA Christine DiDomenico
2123354352



Defendant, Olivier Fluchaire, is a violinist, teacher, and amateur violin and cello bow collector based in New York.

I am informed by Séverine Lauxerrois that she is a French citizen and resident of Grenoble, France. She is the widow of Pascal Lauxerrois, a noted French bow-maker, who left Mrs. Lauxerrois his extensive collection of violin and cello bows upon his death in 1994, including the ten bows relating to the charges in this complaint, which range in value from $10,000 USD-$500,000 USD.

The "FX Tourte bow" is an unbranded cello bow made by the French bow maker François Xavier Tourte circa 1825. The FX Toute bow, which is made of pernambuco with silver and ivory mounts, was valued at $350,000 in 2016. I am informed by Jean-François Raffin, a certified French bow-appraiser based in Paris, that the current value of the FX Tourte bow on today's market would be more than $500,000.

I am likewise informed by Raffin that he has examined the nine other bows in question and that they are worth over $3000 each.

I am informed by the defendant that beginning in 2005 he formed a business relationship with Mrs. Lauxerrois. The defendant was raised in Grenoble, France before moving to New York and was a family friend of Mrs. Lauxerrois and her late husband. He would periodically visit Mrs. Lauxerrois and select bows from her collection to sell on consignment to his violin students in the United States. Once the bows were sold, the defendant would return an agreed-upon portion of the profit to Mrs. Lauxerrois.

Beginning in 2013, this amicable and mutually beneficial business relationship changed. On May 7, 2013, the defendant emailed Mrs. Lauxerrois and offered to buy her François Xavier Tourte cello bow, which was the most valuable bow in her collection. I am informed by Assistant District Attorney (ADA) Christine DiDomenico, who conducted an interview with Mrs. Lauxerrois in July 2022, that Mrs. Lauxerrois initially declined this offer from the defendant, as she was planning to save it as collateral for her retirement. In June 2015, however, Mrs. Lauxerrois needed more immediate funds and so agreed to sell the FX Tourte cello bow to the defendant for €100,000. The defendant paid Mrs. Lauxerrois a down payment of €15,000 in July 2015 and retrieved the FX Tourte bow from her home in France

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Oliver Fluchaire (M 48),

Defendant.

FELONY

ADA Christine DiDomenico
2123354352



in August 2015.

By September 1, 2015, the defendant had consigned the FX Tourte cello bow to Salchow & Sons Bowmakers, located at 244 West 54th Street, 12th Floor New York, NY 10019. By February 3, 2016, the defendant had removed the FX Tourte cello bow from consignment at Salchow & Sons and had the bow shipped to Gabriel Ben-Dashan of Chicago, Illinois. The defendant then sold the FX Tourte cello bow to Ben-Dashan Inc. for $167,500 on February 27, 2016.

I have reviewed emails that demonstrate that between February and September 2016, Paige Ben-Dashan of Ben-Dashan Inc. repeatedly requested that the defendant provide provenance materials, including certificates of authenticity and bills of sale, related to the FX Tourte cello bow's ownership history. Based on my experience and training, I believe these documents were requested to establish that the defendant had good title to sell the bow to Ben-Dashan Inc. The defendant never responded to these requests or provided any proof of ownership for the bow. After Ben-Dashan Inc. wired the defendant the final payment on September 7, 2016, he ceased communication with the dealer and ignored further requests for documentation.

After the initial €15,000 deposit, the defendant sent Mrs. Lauxerrois three other payments towards the agreed-upon €100,000 total for the bow: €7,900 on October 10, 2015, €2,000 on February 6, 2016, and €5,100 in cash in March of 2016. Since March 2016, the defendant has made no further payments towards the FX Tourte cello bow; to date €70,000 of the agreed-upon €100,000 sale remains unpaid.

Since March of 2016, the defendant has made several promises to send additional payments towards the outstanding €70,000 balance, but has failed to follow through on said promises. I am informed by ADA DiDomenico that beginning in 2019, Mrs. Lauxerrois requested that the defendant return the FX Tourte cello bow in exchange for the return of his initial €30,000 payment, as well as the remaining nine bows that she had passed to him for sale between 2012-2015 that he had not yet paid her for; The defendant has repeatedly evaded this request for the past four years.

Between July 2019 and September 2021, I have reviewed multiple emails in which the defendant made repeated appointments, in both the U.S. and France, to return the FX

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>Oliver Fluchaire (M 48),<br><br>Defendant. | FELONY<br><br>ADA Christine DiDomenico<br>2123354352 |



Tourte cello bow to Mrs. Lauxerrois. However, these negotiations and appointments were made under the false pretense that the defendant still had the bow in his possession to return, since these discussions occurred long after he had sold the FX Tourte bow to Ben-Dashan Inc. In his emails and text communications, the defendant offered multiple justifications, including the shut down of the U.S. government, bank regulations in France, and the lack of a CITES permit, to explain why he could neither pay the remainder of what he owed for the FX Tourte bow or return the bow to Mrs. Lauxerrois in exchange for the return of his down payment, which in fact he knew was not in his possession during the entire period because he had sold it.

On September 22, 2022, I interviewed the defendant with Special Agent Chris Rommeney. During this interview, the defendant stated that he had not paid Mrs. Lauxerrois what he owed for the FX Tourte cello bow and that several of the bows he received from Mrs. Lauxerrois had been sold and while others were still in his possession.

On October 7, 2022, I interviewed the defendant again with ADA DiDomenico and Special Agent Chris Rommeney. During this interview, the defendant acknowledged that he had not paid Mrs. Lauxerrois what he owed for the FX Tourte cello bow since 2016, that he had sold the bow for profit in 2016, and that he could not account for the remaining nine bows that Mrs. Lauxerrois had requested be returned to her.

On October 13, 2022, Special Agent Rommeney and I visited the defendant again to retrieve a Nicolas Léonard Tourte violin bow he had voluntarily offered to surrender and return to Mrs. Lauxerrois.

Based on my training and experience, I believe the defendant deceived Mrs. Lauxerrois in order to obtain and profit from the sale of her property by making repeated false representations and promises. The defendant also wrongfully withheld Mrs. Lauxerrois' property after repeated requests for its return.

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>Oliver Fluchaire (M 48),<br><br>Defendant. | FELONY<br><br><br>ADA Christine DiDomenico<br>2123354352 |

**False statements made in this written instrument are punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law, and as other crimes.**

ROBERT E FROMKIN    Digitally signed by ROBERT E
                    FROMKIN
                    Date: 2023.05.22 18:32:15 -04'00'

_____          _____    _____
Robert Fromkin                   Date          Time

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE MATTER OF AN INVESTIGATION INTO STOLEN
MUSICAL INSTRUMENTS

WHEREAS, pursuant to a criminal investigation conducted by the District Attorney of the
County of New York ("DANY"), DANY has concluded that under New York state law, a
Cello Bow by Francois Xavier Tourte, c. 1825, 70.8 cm in length ("**Cello Bow**") was stolen
from its lawful owner and, therefore, constitutes stolen property under New York law;

WHEREAS, DANY has evidence sufficient for the issuance of a judicially authorized search
warrant pursuant to N.Y. Criminal Procedure Law § 690 et seq., and Ko Iwasaki, having been
presented with a portion of the evidence concerning the **Cello Bow**, waives such warrant;

THE UNDERSIGNED HEREBY ACKNOWLEDGES THE FOLLOWING:

    1. Tailim Song, Esq., on behalf of Ko Iwasaki, represents that he is authorized to enter this
agreement, has read and fully understands this agreement, and is agreeing to the terms freely,
knowingly, and voluntarily;

    2. Tailim Song affirms that neither Ko Iwasaki, nor his successors, assigns, or agents will
make any claims under federal law, New York state law, or any other state's law to the **Cello
Bow**; that Ko Iwasaki will not object to its further disposition by the New York State Supreme
Court and/or DANY; and that Ko Iwasaki waives any claim against DANY, the U.S.
Department of Homeland Security, or any of their employees or agents, arising out of the
seizure, retention, and disposition of the **Cello Bow**;

    3. DANY represents that DANY has not uncovered any evidence that Ko Iwasaki
engaged in any criminal activity in connection with the purchase and possession of the **Cello
Bow**; that the evidence proves that Ko Iwasaki is an innocent buyer; and that the **Cello Bow**
shall be disposed of by DANY in accordance with N.Y. Penal Law § 450.10 by returning the
**Cello Bow** to its lawful owner.

Christine DiDomenico
Assistant District Attorney

Dated: 4/17/23

Tailim Song
On behalf of Ko Iwasaki

Dated: 4-14-23